NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 251011-U

NO. 4-25-1011

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 2, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* K.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
| Petitioner-Appellee, | ) | No. 23JA7 |
| v. | ) | |
| Jessica O., | ) | Honorable |
| Respondent-Appellant). | ) | Katherine G. P. Legge, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Zenoff and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court made two findings that, as appellate counsel rightly concludes, it would be frivolous to characterize as against the manifest weight of the evidence: the respondent failed to make reasonable progress, and termination of her parental rights would be in the best interests of the minor.

¶ 2    The circuit court of Tazewell County entered a judgment terminating the parental rights of respondent, Jessica O., to her five-year-old daughter, K.M. Respondent appeals.

¶ 3    Pursuant to *Anders v. California*, 386 U.S. 738 (1967), counsel representing respondent on appeal has moved for permission to withdraw from representing her. See *People v. Jones*, 38 Ill. 2d 384, 385 (1967) (approving the procedure in *Anders*). For reasons that counsel explains in a memorandum accompanying his motion, he does not believe that any reasonable argument could be made in support of this appeal. Respondent was notified of her right to respond to the motion to withdraw, but she had not done so. Consequently, the potential merits

of this appeal are ripe for evaluation.

¶ 4 After reviewing the record, we agree that this appeal lacks arguable merit. Therefore, we grant counsel's motion to withdraw, and we affirm the circuit court's judgment.

¶ 5 I. BACKGROUND

¶ 6 A. The Order Making K.M. a Ward of the Court

¶ 7 On January 10, 2023, Austin Haddock, an investigator with the Illinois Department of Children and Family Services (DCFS), filed a shelter care petition. In the petition, he alleged that K.M. was a neglected minor under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)) in that, for essentially two reasons, her environment was injurious to her welfare.

¶ 8 The first reason was respondent's drug abuse. According to the petition, respondent was on probation for unlawful possession of methamphetamine, was "constantly using with her child [K.M.] present," and had repeatedly violated probation by missing drug-screening appointments.

¶ 9 The second reason was domestic violence. On December 12, 2022, according to the shelter care petition, K.M. was home with respondent. K.M.'s father, Joshua M., had been living with them in the apartment off and on. He and respondent did not get along, and at respondent's insistence, he vacated the premises. Nevertheless, he returned to the apartment later that day, and when respondent refused to admit him, he broke in by shattering a sliding glass door. He and respondent then had a heated altercation, in which he pinned her down on a bed. He entered the living room and threw things. He broke a television screen by hurling a shot glass at it. He locked himself into K.M.'s bedroom with K.M. When respondent warned him that she was calling the police, he replied that the police would not arrive in time. Respondent screamed to the

dispatcher, on the phone, that Joshua M. had a gun. Joshua M. left the apartment before the police arrived, but the police found him and arrested him. A neighbor told the police he had seen Joshua M. stash a pistol behind an air conditioner at the apartment complex. The police found the pistol behind the air conditioner, and the pistol was loaded with hollow point bullets, one of which was chambered.

¶ 10        On May 11, 2023, citing those factual allegations in the shelter care petition, which the circuit court deemed to have been proven, the court entered an adjudicatory order finding that (1) K.M. was a neglected minor and (2) respondent and Joshua M. had inflicted the neglect. Also, the court entered a dispositional order making K.M. a ward of the court and placing her in the custody of the guardianship administrator of DCFS.

¶ 11                    B. The Petition for Termination of Parental Rights

¶ 12        On May 6, 2024, the State filed a petition for termination of parental rights to K.M. Count I of the petition alleged that respondent was an "unfit person" within the meaning of section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2024)) in that, during a nine-month period after the adjudication of neglect, specifically, August 2, 2023, to May 2, 2024, respondent failed to make reasonable progress toward the return of K.M. to her care. Count II alleged that Joshua M. likewise failed to make reasonable progress during the same period. Count III, in a supplemental petition, alleged that, additionally, Joshua M. was an "unfit person" within the meaning of section 1(i) of the Adoption Act (*id.* § 1(i)) in that he was depraved. (We note that Joshua M. is not a party to this appeal.)

¶ 13        C. The Fitness Hearing on the Petition for Termination of Parental Rights

¶ 14        On May 15, 2025, the circuit court held an evidentiary hearing on whether the parents were in fact "unfit persons" as alleged in the petition for termination of parental rights.

Respondent and the attorney representing her at that time, Caitlin Paluska, attended the hearing. Joshua M.'s attorney attended the hearing, but Joshua M. himself did not attend. The other attorneys in attendance were the assistant state's attorney, Anna Peters, and the guardian *ad litem*, Debbie Harper.

¶ 15        When the circuit court asked the parties if they were ready to proceed, Paluska requested a continuance because she needed more time to meet with respondent and confer with her regarding the case. Paluska explained that, since August 2024, when Paluska was appointed, respondent kept changing the phone numbers at which she could be reached, giving Paluska four different phone numbers over the preceding nine months. The latest phone number did not work because, as it turned out, respondent had broken her phone. Lacking a current phone number for respondent, Paluska had been unable to contact her. Consequently, Paluska needed a continuance so that she could "talk with [respondent] in regards to if she want[ed] to continue with her denial [of count I], if she want[ed] to proceed to trial, or any of her other options."

¶ 16        Peters objected because, first, respondent had been represented in this case by an attorney since May 6, 2024, when the petition for termination of parental rights was filed, and "they could have been preparing for an entire year on this case as pretty much I think I have." Second, Peters had arranged for two police officers to come to the hearing and testify, and one of the police officers had traveled from Springfield, Illinois (to Peoria, Illinois, where the hearing was being held). Third, even if respondent's phone was broken, she knew her attorney's name and could have contacted her. Fourth, Peters had spoken with the caseworker, Stephanie Church, who said she had been in weekly contact with respondent Thus, from conversations with Church, respondent had known "this day was coming," and she could have been prepared. For all those reasons, Peters objected to the proposed continuance.

- 4 -

¶ 17        Harper likewise objected to the proposed continuance because the case had been pending since May 2024 and it had been "continued numerous times."

¶ 18        The circuit court noted that the case had "been pending for over a year" and that although Paluska had not been respondent's attorney that entire time, she had been her attorney since August 2024 and if respondent's phone had been disconnected, respondent should have gotten in contact with Paluska. The court confirmed with Paluska that she had "had discovery this entire time." The court observed, as Peters had observed, that witnesses had come to testify. Consequently, although the court was willing to allow Paluska and respondent a 15-minute break to confer together, the court declined to grant a continuance.

¶ 19        After a break, the State proceeded with its presentation of evidence. The State requested that the circuit court take judicial notice of the adjudicatory and dispositional orders the court entered on May 11, 2023. There was no objection, and the court took judicial notice of those two orders. Also, without objection by any of the other parties, the court took judicial notice of certified court records showing that, in Tazewell County, Joshua M. had been convicted of possession of another's credit or debit card, unlawful use of a weapon by a felon, criminal trespass to a residence, criminal damage to property, aggravated battery, and resisting a peace officer. Finally, without objection by any of the other parties, the court admitted into evidence some treatment records pertaining to respondent, specifically, records from Gateway Foundation (Gateway) and Memorial Behavioral Health (Memorial).

¶ 20        The State then called its witnesses, including Springfield police officer Todd McBride. He testified that, on March 23, 2024, at about 12:30 p.m., he went to a trailer park in Springfield in response to a report that an intoxicated female driver was ramming vehicles. At the trailer park, McBride spoke with Ashley (last name unspecified), who told him that the driver

ramming the vehicles might be named Jessica. McBride saw the suspect driving down the street, and he stopped her vehicle. The driver was respondent, and she had a passenger, a 15-year-old girl. Smelling a strong odor of alcohol on respondent's breath, McBride believed that respondent was intoxicated. Therefore, he administered to her a battery of field sobriety tests. After "fail[ing] the walk and turn, the horizontal gaze nystagmus, and a couple other things" (to quote McBride's testimony), respondent submitted to a preliminary breath test which yielded a result of 0.214—"almost triple the legal limit," McBride noted. He saw, in respondent's vehicle, "empty vodka *** shot shooters" and a couple of "silver containers of whippets," small containers for taking shots of nitrous oxide. He arrested respondent for driving under the influence of alcohol (DUI). On the way to jail, respondent "urinated in the back of [McBride's] patrol vehicle," "slipped her handcuffs off," and "dropped the handcuffs into the puddle of pee."

¶ 21        After McBride testified, the State called Janelle Robinson, the caseworker who had been assigned to K.M.'s case throughout the nine-month period of August 2, 2023, to May 2, 2024. Robinson testified essentially as follows. During the nine-month period, respondent was supposed to "complete a parenting education, domestic violence for victims at that time, substance abuse assessment and treatment, and counseling, and three times per month drug drops." The case had come to the attention of DCFS  "due to drug use and domestic violence." Respondent had a severe addiction to alcohol, methamphetamine, and opioids. During the nine-month period, she missed "[j]ust a few" drug screening appointments, once because of COVID-19. "[O]verall," however, she "complete[d] the drops," all of which tested negative. After undergoing the required substance abuse assessment, respondent completed rehabilitative treatment in February 2024. She also completed parenting classes before the expiration of the nine-month period. Her visits with K.M. went well, without any need for a parenting coach.

Robinson remarked in her testimony, "I would say what stuck out to me was when I saw them interacting with one another, [respondent] did not spend time on her phone which is big to me, and I mean they had a good relationship I would say." In fact, "[i]n the beginning of the case," K.M. would have "a hard time when [respondent] would leave the visits."

¶ 22	In sum, according to Robinson's testimony, respondent kept in contact with Robinson during the nine months, remained cooperative, stayed employed to the best of her ability, maintained stable housing, and did what was asked of her—with one exception: she did not complete counseling, as she was supposed to do after "drug treatment was done."

¶ 23	Apropos counseling, there was the following exchange between the State and Robinson:

> "Q. On April 24th, 2024, at 8:00 a.m., did [respondent] accept the call from the counselor?
>
> A. Not according to the records.
>
> Q. Okay. And you receive records as part of being a caseworker; is that correct?
>
> A. Yes.
>
> Q. On the 24th, did the agency—the counseling agency call [respondent] at that time to reschedule that appointment?
>
> A. Yes.
>
> Q. The time that was already scheduled for her first counseling questions?
>
> A. According to records.
>
> Q. What happened?
>
> A. They left—from what they recorded, there were two voicemails left.

Q. And she did not respond?

A. No.

Q. Okay. And then—so did [respondent] ever successfully complete counseling during the time period?

A. No."

¶ 24 Respondent underwent substance abuse treatment at Gateway, and the records from Gateway were admitted into evidence, without objection, as State's exhibit No. 5. The "Gateway Treatment Plan," dated September 15, 2023, described the "Problem" as follows:

"[Respondent] shared 'I've never been to treatment before. I started drinking a little when I was 13. When I turned 16, I started drinking a lot. I was drunk a lot. Then I started smoking and doing Cocaine. Then I started stripping. Then I started doing pills and ecstasy. When I was 20 I was hanging around other people and it got really bad. I quit cold turkey when I met my baby dad and it was easy. I started back when my daughter was 1. My baby dad and I just started back using again around that time. I was working full time and doing everything by myself and it just got stressful. I have an order of protection against him now because he threatened to kill me and the police were involved. DCFS is involved now and my daughter is in the custody of a good friend who is also my baby dad other baby mother.' "

Respondent further reported to Gateway, " 'I'm not sure what they diagnosed me with but I have anxiety and depression and I have ADHD really bad. I was self-medicating with METH.' " Gateway diagnosed respondent with, among other conditions, "Meth use disorder, severe; Meth withdrawal, Alcohol use severe, alcohol withdrawal; Opioid use disorder, Severe, Opioid

withdrawals." The "Gateway Treatment Plan" identified the following objective: "[Respondent] will develop and use at least 5 skills to decrease emotional distress without using substances. She will also reach out and make a mental health appointment with an outside provider."

¶ 25 According to a certified copy of clinical progress notes from Memorial dated December 18, 2023 (State's exhibit No. 6), respondent "would like to maintain her sobriety by learning coping skills in counseling." The notes continue:

> "Counseling was recommended for her in her [discharge] plan from gateway. ***
> She attributes her symptoms to grief and past trauma. She reports that while in
> Gateway she was prescribed medication for depression and anxiety which has
> significantly improved her symptoms. She now wants to work on coping and
> processing trauma in therapy."

¶ 26 A discharge summary by Memorial, dated July 30, 2024, notes that respondent "did not complete" the initial assessment and "did not make an attempt to reschedule the appointment." The "Reason for Discharge" was expressed in one word—"Inactive"—and "[n]o interventions [were] provided due to initial assessment not being completed." Clinical progress notes for May 29, 2024, recount:

> "[Respondent] did not answer initial phone call at 1:30pm so the appt started late.
> Writer spoke with [respondent] about current stressors and gathered some of the
> general information. The line cut out after 23 minutes. Writer attempted to contact
> [respondent] 2x after that and [respondent] did not answer. Writer left a voicemail
> requesting that [respondent] contact [Memorial] by 6/19/24 otherwise she will be
> discharged."

A clinical progress note for April 24, 2024, adds that "if the next appt is missed there will be a 90

day penalty period."

¶ 27      Those medical records were admitted on the first day of the hearing. On the second day of the hearing, Paluska again requested a continuance, this time because respondent wished to "hire private counsel." Peters likewise objected to this proposed continuance because "[w]e're mid-trial," the private counsel had not entered his appearance, it would take months to prepare transcripts for the private counsel, and the continuance was merely an attempt to delay the case. Harper likewise objected because the case had been continued multiple times and a continuance would not be in the best interests of K.M. The circuit court decided, "[T]his is very clear to me that this is for purposes of delay." The court noted that respondent presently had counsel and that there was "no issue with that representation." The case had "been pending for quite some time," and the court agreed with Harper that "months long delays by adding a new attorney at this time" would not be in the best interests of K.M. Therefore, the court denied respondent's second motion for a continuance.

¶ 28      The State then resumed its presentation of evidence, calling a caseworker, Melanie Brennan, to testify regarding the counts against Joshua M. She testified that she had sent letters to him in prison but had received no reply. After he was released from prison in December 2024, she sent letters to his parents' address in Morton, Illinois, and to an address in Peoria that a diligent search had revealed, but she received no phone call or letter from Joshua M. in response. She did not know where he was living. Also, the State presented the certified records from the circuit court of Tazewell County showing his criminal convictions.

¶ 29      After the State rested, respondent testified on her own behalf. The gist of her testimony was this. In September 2023, she successfully completed an inpatient program. She then moved into a sober living house in Springfield. After missing curfew from working a late

shift, she moved into another sober living house in Springfield and worked a night shift at Buffalo Wild Wings. She attended outpatient treatment during the day. To earn a higher salary to provide for herself and K.M., she got a new job at Sweepy Cleans. She worked for that company until May 2024, about "a month and half before [she] had [H.O.]" From her increased earnings, she was able to save up enough money for a deposit on a trailer, and she signed a lease in February 2024. She moved out of a friend's house (someone whom she "was in outpatient with") and moved into the trailer. After her inpatient stay, she went to Gateway in Springfield for outpatient treatment. She also attended Narcotics Anonymous (NA) and Alcoholics Anonymous (AA) meetings in Springfield every day. She was arrested for DUI, however, in March 2024, when she was five months pregnant. She "felt stupid and ashamed, so a few days after [her] DUI, [she] ended up going right back to NA and AA," and she continued attending those meetings "until at least May 2nd, 2024," "right before [she] had the baby." Whenever she was not attending NA and AA meetings, she would go visit K.M. at the foster home. She visited K.M. at least a couple of times a week. Until around Easter 2024, she was allowed to continue visiting K.M. in the foster home. The visits were supervised. The foster mother brought K.M. to the trailer once, but "other than that, [they] just went to McDonald's" because K.M. "had more fun playing" there.

¶ 30        On cross-examination, respondent testified that she moved into the first sober living house in September 2023 and that she lived in that house about a month, until she "got into it with the house manager" because the house manager's boyfriend, Willy Norman, asked respondent for her phone number. Norman made this request to respondent in the house manager's presence, generating "bad energy." So, in October 2023, with Gateway's help, respondent found another sober living house in Springfield and took up residence there. She

lived in this second sober living house for only a couple of weeks because, one night, when she returned from working a late shift, it was after curfew, and the code to the door had been changed and she could not get in. She testified, "They took everything I ow[n]ed and came to Springfield with." From then on, respondent "was kinda scarred about sober living," so she moved in with a friend named Angie, whose last name respondent did not know—it was someone with whom she attended outpatient treatment, the only person in Springfield she knew. Respondent lived with Angie for a couple of months and then moved into the trailer, which was her residence until H.O. was born, on May 2, 2024.

¶ 31        The day of the DUI, respondent continued on cross-examination, she was five months pregnant, and the father possibly was Norman. She could not remember the name of the 15-year-old girl who was riding in the car with her when she was arrested for DUI. The girl was the daughter of respondent's friend Tammy, whose last name respondent did not know. Respondent explained:

> "That was the only time I'd ever seen that [15-year-old] girl and she went—she only jumped in the car to go with me because I said I wanted to go change my locks at the house because [Norman] got my keys somehow and I seen on my cameras he was taking stuff out of my house and he was not welcome there."

Respondent could not remember the address of "the NA place," either.

¶ 32        Respondent rested. The other parties stated they had no further evidence. After closing arguments, the circuit court found that the State had proven, by clear and convincing evidence, the counts directed against Joshua M., count II and III of the petition for termination of parental rights. In other words, the court found that he had failed to make reasonable progress and that he was depraved.

¶ 33            Next, the circuit court discussed count I, the count alleging that respondent failed to make reasonable progress from August 2, 2023, to May 2, 2024. The court perceived, from the evidence, that K.M. came into care because of respondent's "very severe" problem of substance abuse—the Gateway records indicated that "alcohol had been an issue since she was a young teen"—and also because of domestic violence resulting from "poor relationships." The court acknowledged that, although respondent failed to complete counseling, she had "absolutely worked very hard" to overcome her alcoholism and substance addictions. The court acknowledged her completion of inpatient and outpatient treatment and her negative drug screenings. The court acknowledged that, by her own testimony, respondent had "some sort of AA, NA support system," although the court remarked that "it would be pretty tough to go to that daily and not having the specificity of recall of some of those details." Even so, the court found an honest effort by respondent to rehabilitate herself from drug and alcohol addiction.

¶ 34            The circuit court was less satisfied, however, by the measures that respondent had taken to maintain stable housing. There was "not a stable, suitable housing [during] that timeframe." The court commented, "You know, you didn't like the first place because you took the manager's boyfriend basically and then that's kind of self-created and seems to not hold sobriety at the first and foremost priority." The court was "happy [that respondent] had a job and that [she was] working," but the court had a difficult time believing that the second sober living house threw her out because her work schedule caused her to miss curfew: "a *bona fide* sober living house I think would understand that and expect if that's someone's schedule that would be when they would come back." So, the court had "some credibility issues as it relates to that story." While commending respondent for finally finding her own place in which to live, the court remarked:

"Yet, this was the neighborhood in which this whole drunken car ramming, 15-year-old in the car, pregnant happened. So it doesn't sound like a good neighborhood. Maybe the house itself was fine, but this—that's not going to be a location where you are going to thrive with the kid in your care."

¶ 35 Finally, the circuit court "[could not] get past" several troubling aspects about the March 2024 incident. The court explained:

"[I]n spite of the extraordinary efforts that [respondent] had gone to to become sober, none of that still didn't work so to speak. And, you know, a relapse is one thing, but a complete lack of judgment and who you surround yourself with, what choices you make when you are carrying an unborn child are a lot different.

And, you know, the—you're drinking extremely with being pregnant in your, what? Would that be second trimester? You have another minor in the car with you. You're endangering another minor. You're—you know—the testimony was that the call was about you ramming vehicles. That's a—that's a pretty violent event in my book, the way I see it. And I don't call that progress. And it's certainly not reasonable when you look at the totality of the circumstances.

And so it's for those reasons I am going to find that the State has carried their burden by clear and convincing evidence as to Count I."

¶ 36 D. The Dispositional Hearing on K.M.'s Best Interests

¶ 37 1. *The Report From FamilyCore*

¶ 38 On September 4, 2025, the circuit court held a hearing on the question of what disposition would be in the best interests of K.M. Two employees of a contract agency, FamilyCore, had written a report, with two addenda, on that question. The authors were Brennan,

whose job title was child welfare specialist, and Jill Bachman, whose job title was child welfare director. The court considered the report, which contained indications that respondent still was subject to episodes of drug abuse. According to the main body of the report, which was filed on July 3, 2025, she gave birth in July 2024 at a hospital in St. Louis, Missouri, and at that time tested positive for methamphetamine. Consequently, the newborn was taken into protective custody. Although the circuit court had ordered respondent to submit urine samples three times a month when randomly requested to do so, she failed to appear for 17 such drug screenings in 2024. When attending drug screenings in 2024, she usually tested negative, but she sometimes tested positive for amphetamine or cocaine. She did not attend any drug screenings in 2025.

¶ 39        According to the first addendum to Brennan and Bachmann's report, filed on July 8, 2025, respondent was found, on two occasions in 2025, to be traveling with persons connected to illegal narcotics and criminal wrongdoing. On May 7, 2025, she was a passenger in a car when it was pulled over. The other passenger admitted they had come from a flophouse, "a common place for narcotics use." A firearm was found in the car, and the driver was arrested for unlawful possession of a firearm by a felon. On June 23, 2025, respondent again was a passenger in a car that the police pulled over, and the car was driven by someone who not only lacked a valid driver's license but also "had a history of methamphetamine possession."

¶ 40        In June 2025, the first addendum continued, Christine Crumrine, a counselor at Gateway, reported that respondent last attended a group session on May 19, 2025, and that she had been dropped from the program because of nonattendance.

¶ 41        By contrast, according to the second addendum, which was filed on September 2, 2025, respondent was doing better at drug rehabilitation. On August 12, 2025, she completed residential treatment at Chestnut Health Systems. Afterward, she moved into Oxford House, a

sober living house in Peoria. She attended a drug screening on August 15, 2025, which was negative for all substances.

¶ 42                                    2. *Brennan's Testimony*

¶ 43            The State called Brennan, who testified that she had been the caseworker assigned to K.M.'s case since August 1, 2014. She further testified on the following topics.

¶ 44                        a. The Foster Mother and Teenage Half-Brother

¶ 45            The foster mother, Ashley H., was a licensed foster parent, and five-year-old K.M. had lived with her since January 2023. Ashley's 13-year-old son also was a member of the household. He and K.M. had the same father, Joshua M. K.M. had a good relationship with her half-brother and with Ashley, whom she addressed by her first name. Brennan testified, "[K.M.] is very attached to the foster mom. She's talking to her, playing with her. She's hugging her. She's asking questions." To Brennan, who made scheduled visits to the foster home "at least once a month," there appeared to be "a strong bond," "[i]n both directions," between K.M. and Ashley.

¶ 46                                    b. The Foster Home

¶ 47            Brennan described the foster home as "clean and appropriate." K.M. had a bedroom of her own, which was clean, decorated, and stocked with toys.

¶ 48                                    c. Basic Physical Needs

¶ 49            Ashley provided food and clothing for K.M., who had a pediatrician and a dentist and was up to date with all her appointments and immunizations. K.M. had "been in therapy" and had "some separation anxiety."

¶ 50                                    d. School and Babysitting

¶ 51            K.M. had just started kindergarten. She had experienced anxiety about going to

preschool, but her response to kindergarten was different: she "loves it," "[g]ets up," and "is super excited every single day." K.M. had a babysitter when Ashley was at work. Ashley had "a support system": "some other family members that are around and some friends that help with baby-sitting."

¶ 52                                    e. Domestic Violence

¶ 53          FamilyCore became aware of a police report documenting domestic violence that was perpetrated upon respondent on July 5, 2025, about a month before she completed substance abuse treatment. Brennan was unsure when she became aware of this incident. It was not until after July 2025 when she learned of the police report—and she learned of it through another caseworker, Church (who was assigned to H.O.'s case), instead of through respondent. According to the police report, respondent was with a man named Hayden Hendricks. Brennan knew that Hendricks was "a biological parent on another child welfare case that [FamilyCore was] handling." By her understanding, he had "a drug problem and a criminal history" and was "not a fit parent." The domestic violence involved him and respondent. When Brennan confronted respondent about the police report, respondent minimized the incident as mere yelling and stated that she did not know why the police had been called. According to the police report, though, someone saw Hendricks slamming respondent against a bathroom wall.

¶ 54                                    f. Visitation

¶ 55          Brennan had observed three or four visits between respondent and K.M. On August 18, 2025, six days after respondent completed substance abuse treatment, "[t]he visit went very well." Brennan continued:

> "[Respondent] seemed coherent. She was very happy to see the girls. The girls were
> happy to see her. She brought things for them. She was very attentive. I was able to

have conversations with her. I believe that's probably the first time that I have seen her sober and it was a very good visit."

¶ 56    The visits were supervised and took place at the agency. At the last visit, K.M. called respondent "mom" and ran to hug her upon arrival in the waiting area. Brennan recounted:

"[K.M.] was excited to see her. [Respondent] was excited to see the kids. She had some stuff with her. We went back to the visit room. She was talking to [K.M.] mostly. She was also talking to [H.O.] but [H.O.] is one, so she had brought some items. She brought some snacks for the girls. She brought a craft that she had made for *** [K.M.], *** like a wall hanging that she had made either at rehab or at Oxford House and some gifts for them and she sat down and played. She opened the snacks. Yeah. It was a very good visit."

¶ 57    When it was time for the visit to end, "we cleaned up," and respondent "came out and was going to help get the kids in the car." K.M. was crying: she "was very upset the visit was over" and "was sad to say good-bye." They took a few minutes to allow her to calm down before leaving the agency. "[B]y the time we got back there," Brennan testified, K.M. "was at the baby-sitter and playing with her friend that was there and she was happy."

¶ 58    This visitation on August 18, 2025, in which respondent was sober and fully present, was "drastically different" from Brennan's previous interactions with her. The State asked Brennan to describe the "visits for the other approximately 11 months." Brennan answered, "She didn't really seem to be all there. Sometimes she wasn't like making eye contact. She was very erratic. She would be talking like to herself and not really paying attention to me or to [K.M.], so it appeared like she had been under the influence those other times."

¶ 59    Despite the dramatic transformation that was evident in the most recent visit,

Brennan was still of the "opinion that it would be best for [K.M.] for parental rights to be terminated and the goal to change to adoption."

¶ 60                                   3. *Ashley's Testimony*

¶ 61            The State next called Ashley. She testified she had two sons, aged 13 and 21, who had the same father as K.M., Joshua M. The 13-year-old son lived with Ashley and K.M., and the 21-year-old son lived away from home, with his girlfriend. If Ashley needed a babysitter—if she was working late and could not pick K.M. up in time from preschool—the 21-year-old son and his girlfriend would watch K.M., who, according to Ashley, was attached to her half-brothers.

¶ 62            When, in December 2024 or January 2025, Joshua M. was released from prison, he saw his children, but his contact with them had always been sporadic. For a time, after he was released, he lived at his mother's house, and his two sons stayed overnight with him there a couple of times. He "relapsed," however, and moved to St. Louis, and since about February 2025, there has been no contact between him and the children. K.M. had no relationship with Joshua M.

¶ 63            Ashley testified that she loved K.M. and that she would like to adopt her. She thought that adoption would be better for K.M. than guardianship. When asked why, she explained, "[Respondent] has gone to rehab four times and relapsed and *** you just don't know what's going to happen in the future with that."

¶ 64            After closing arguments, the circuit court acknowledged the bond between K.M. and respondent and complimented respondent on her completion of inpatient treatment and her current abstention from drugs, as evidenced by recent negative drug testing results. The court decided, however, that "[t]he biggest factor for me here is the child's need for permanence, and

that kind of leads the list of factors that favor termination." The court noted that respondent had been in rehabilitation multiple times. In the court's view, this history of relapsing did not bode well for the stability that K.M. needed. Finding, then, by a preponderance of the evidence that termination of parental rights would be in the best interests of K.M., the court terminated the parental rights of respondent and Joshua M. to K.M.

¶ 65        This appeal by respondent followed.

¶ 66                              II. ANALYSIS

¶ 67                           A. The Continuances

¶ 68        The first question that counsel explores, in the memorandum accompanying his motion to withdraw, is whether any reasonable argument could be made that the circuit court erred by denying the two motions to continue the fitness hearing. Counsel observes that our standard of review would be to ask whether the denials were abuses of discretion. See *In re Tashika F.*, 333 Ill. App. 3d 165, 169 (2002). Counsel further observes that convincing us of an abuse of discretion would not be enough; he also would have to show that respondent suffered prejudice from the denials. See *id.* Counsel does not think he could seriously argue either an abuse of discretion or prejudice.

¶ 69        We agree. "Once the case reaches the trial stage, the party seeking a continuance must provide the court with especially grave reasons for the continuance because of the potential inconvenience to the witnesses, the parties, and the court." (Internal quotation marks omitted.) *In re Marriage of LaRocque*, 2018 IL App (2d) 160973, ¶ 94. The reasons must be especially weighty in proceedings pursuant to the Juvenile Court Act, for "serious delay in the adjudication of abuse, neglect, or dependency cases can cause grave harm to the minor." (Internal quotation marks omitted.) *In re A.F.*, 2012 IL App (2d) 111079, ¶ 36. We do not see how the record before

us could supply a compelling justification for a continuance. Respondent had no apparent excuse for putting Paluska in the predicament of being unable to reach her. If respondent could stay in contact with her caseworker, she could have stayed in contact with Paluska. Thus, the denial of the first request for a continuance could not be reasonably characterized as an abuse of discretion.

¶ 70　　　　The same is true of the circuit court's second refusal to grant a continuance. "Our supreme court held that we will not find an abuse of discretion in denying a continuance for substitution of counsel in the absence of ready and willing substitute counsel." *In re S.W.*, 2015 IL App (3d) 140981, ¶ 33. The record appears to lack evidence that substitute counsel would have been ready to proceed. The State pointed out that the substitute counsel "would have to get a transcript of all of those proceedings, thereby delaying this trial." Even the willingness of substitute counsel was unclear: he had not entered his appearance.

¶ 71　　　　We cannot say it was unfair or unreasonable of the circuit court to regard the motions for a continuance as delaying tactics. We do not see what respondent would have gained from a continuance, other than a delay for the sake of delay. Therefore, she suffered no arguable prejudice from the denials.

¶ 72　　　　　　　　　B. Lack of Reasonable Progress

¶ 73　　　　To terminate parental rights, the circuit court must make two separate and distinct findings: (1) the biological parents of the child validly executed a voluntary surrender of their parental rights and a consent to adoption, or, alternatively, it has been proven, by clear and convincing evidence, that the parents are "unfit persons" within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)) and (2) it has been proven, by a preponderance of the evidence, that it would be in the best interests of the child to terminate

parental rights and to appoint a guardian and authorize that guardian to consent to an adoption of the child. 705 ILCS 405/2-29(2) (West 2024); *In re D.T.*, 212 Ill. 2d 347, 352, 366 (2004); *In re M.M.*, 226 Ill. App. 3d 202, 208-09 (1992).

¶ 74 Respondent did not surrender her rights to K.M. Therefore, the first prerequisite to termination of her parental rights to K.M. was a finding, by clear and convincing evidence, that she was an "unfit person" within the meaning of the section of the Adoption Act that the State cited in count I of its petition for the termination of parental rights, namely, section 1(D)(m)(ii) (750 ILCS 50/1(D)(m)(ii) (West 2024)).

¶ 75 That section provides as follows:

"D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following ***:

\* \* \*

(m) Failure by a parent *** (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected *** minor under Section 2-3 of the Juvenile Court Act [(705 ILCS 405/2-3 (West 2024))] ***." *Id.*

¶ 76 In *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001), the supreme court described the following benchmark for measuring "reasonable progress" under section 1(D)(m) of the Adoption Act:

"[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the

condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent."

¶ 77 "[R]easonable progress is judged by an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). "Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *Id.*

¶ 78 In reviewing a challenge to the circuit court's finding that a parent failed to make reasonable progress, we must determine whether the finding is against the manifest weight of the evidence. See *C.N.*, 196 Ill. 2d at 208. A finding is against the manifest weight of the evidence only if it is "clearly evident," from the evidence in the record, that respondent's conformance to the statutory definition in question was unproven. *Id.* If reasonable minds could disagree about whether a given statutory definition was proven by clear and convincing evidence, we will uphold the circuit court's finding. See *Kaloo v. Zoning Board of Appeals for the City of Chicago*, 274 Ill. App. 3d 927, 934 (1995).

¶ 79 We agree with counsel that it would be impossible to argue, in good faith, that the circuit court's finding of a lack of reasonable progress by respondent is against the manifest weight of the evidence. It would be difficult to dispute that respondent's alcoholism was a "condition[ ] *** which would prevent the court from returning custody of the child to the parent." *C.N.*, 196 Ill. 2d at 216-17. A court could not conscientiously return a child to an injurious environment. "[A]lthough isolated incidents of a parent's drug usage do not necessarily pose a danger to a child [citation], obviously an ongoing pattern of substantial abuse can create

an injurious environment." (Internal quotation marks omitted.) *In re K.E.-K.*, 2018 IL App (3d) 180026, ¶ 16.

¶ 80　　　　　Could a reasonable trier of fact regard the DUI that respondent committed during the nine-month period as part of an ongoing pattern of substantial abuse of alcohol? Yes, such a view of the evidence would be within the range of reasonableness, and to contend otherwise would be frivolous. If rehabilitative treatment proved ineffectual, judging by a serious relapse during the nine-month period (as the DUI undisputably was), a trier of fact could justifiably find that the parent's progress during the nine-month period had been less than reasonable. As the appellate court put it in *In re Dar. H.*, 2023 IL App (4th) 230509, ¶ 59:

> "The point of requiring parents to attend classes and engage in services is not just so the parents can say they attended; it is so parents *apply* what they learn in their lives, in the real world, such that the court can be confident that the children will be safe in their care." (Emphasis in original and internal quotation marks omitted.).

A serious lapse in application could be regarded as a failure to make reasonable progress. Failing to undergo counseling to address underlying psychological problems that lead to substance abuse likewise could be regarded as a failure to make reasonable progress. Any argument to the contrary would be unserious, a failure to take seriously our deferential standard of review.

¶ 81　　　　　　　　　　　C. The Best Interests of K.M.

¶ 82　　　　　The same deferential standard of review applies to the circuit court's finding, by a preponderance of the evidence, that termination of parental rights would be in the best interests of K.M. We must decide whether the circuit court made a finding that was "contrary to the manifest weight of the evidence" when it found that terminating respondent's parental rights

would be in the best interests of K.M. See *In re R.L.*, 352 Ill. App. 3d 985, 1001 (2004).

¶ 83 Counsel does not believe he could reasonably characterize that finding as against the manifest weight of the evidence. He acknowledges the bond between K.M. and respondent, but he points out that there also is a bond between K.M. and her foster mother and half-brothers. See 705 ILCS 405/1-3(4.05)(d) (West 2024) (providing that, when making a best-interest determination, a court shall consider "the child's sense of attachments").

¶ 84 Love is not enough; a child also needs stability. Despite respondent's apparent improvement that was documented in the second addendum, a reasonable trier of fact could be ambivalent about the staying power of the improvement. Counsel observes:

> "The reports and evidence considered on appeal rev[eal] that [respondent] continued to have involvement with law enforcement for events relating to substances and domestic violence. She had been discharged from substance abuse treatment, missed all of her drug drops in 2025, hade not reengaged in domestic violence classes, had engaged in [a] new and violent relationship with an unfit person, and was in danger of being evicted. Furthermore, the caseworker testified that the last visit she witnessed, on August 18, 2025, was the first time she had seen [respondent] sober.

> In contrast, the minor was well cared for and loved in the foster parent's home."

Thus, counsel does not minimize that respondent loves K.M. and K.M. loves respondent, nor do we, but he observes that K.M. is loved in the foster home, too, and that, in addition to having love there, she has stability there. The circuit court could not be reasonably faulted for giving dispositive weight to "the child's need for permanence which includes the child's need for

stability." *Id.* § 1-3(4.05)(g).

¶ 85                                    III. CONCLUSION

¶ 86        For the reasons stated, we grant counsel's motion to withdraw, and we affirm the circuit court's judgment.

¶ 87        Affirmed.